IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| RHONDA F. JONES, | ) |
| *Plaintiff,* | ) ) ) ) |
| v. | ) ) ) No. 1:20-cv-365 |
| OHIO NATIONAL LIFE INSURANCE COMPANY and OHIO NATIONAL LIFE ASSURANCE CORPORATION, | ) ) **JURY TRIAL DEMANDED** ) ) ) |
| *Defendants.* | ) |

**COMPLAINT**

1. Like millions of Americans, Plaintiff Rhonda Jones trusted her insurance company and its agents to sell her products that were suitable to her age, needs, income, assets, and risk tolerance. In fact, Ohio and Federal law require that they do so.

2. But in this case, that trust was misplaced. Instead, her insurance agent—who had recently declared bankruptcy, faced hundreds of thousands of dollars in liens, and had been credibly accused by other clients of selling them unsuitable products—sold Jones a "key man" variable life insurance policy.

3. These policies are generally purchased by companies to ensure business continuity in case a key executive dies. They are usually paid for by the company, for the benefit of the company.

4. This policy (initially for nearly $5 million, later increased to $6 million) was, on its face, unsuitable for a middle-aged, middle-income woman who worked as a part-time bookkeeper at a modest, husband-and-wife packaging company. It was also unbelievably expensive, at a premium cost of $200,000 annually, paid for by Jones.

5. Despite the facial unsuitability of this product for Jones, Defendants in this case issued the policy without any investigation of its suitability. Had they investigated, they would have uncovered even more evidence of unsuitability, such as the fact that the annual premiums were nearly four times Jones' annual income; that the agent had falsely inflated her income and assets on her application and told her that the premiums were tax deductible, when they were not; that her employer was not a company that could ever need a "key man" policy; and that the agent's deteriorating financial situation gave him incentives to over-sell financial products. Defendants issued this policy for a simple reason: key man policies are highly profitable.

6. Jones paid $400,000 in premiums for an insurance policy that she never needed, never wanted, and should never have been sold. Defendants are liable under Ohio and Federal law for the damages she has sustained because of the sale of this unsuitable product.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331, because it alleges a violation of Rule 10b-5 of the 1934

Securities Exchange Act, codified at 15 U.S.C. § 78a (implementing regulations at 17 C.F.R. § 240.10b-5). The Court has jurisdiction over the pendent state law claims under 28 U.S.C. § 1367(a).

8. Alternatively, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is diversity of the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

9. This Court has personal jurisdiction over Defendants because their principal places of business are in this State.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this district.

11. Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(c)(2) because this Court maintains personal jurisdiction over Defendants.

## PARTIES

12. Plaintiff Rhonda Jones is a citizen of Charlotte, North Carolina and was at all times relevant.

13. Defendant Ohio National Life Insurance Company, a wholly owned stock subsidiary of Ohio National Financial Services, Inc., has its principal place of business in Cincinnati, Ohio. Defendant Ohio National Life Assurance Corporation, a wholly owned stock subsidiary of Ohio National Life Insurance Company, has its principal place of business in Cincinnati, Ohio.

14. Plaintiff reserves the right to amend this Complaint to add other defendants as discovery continues.

## FACTUAL ALLEGATIONS

15. In 2016, Plaintiff Rhonda Jones was a part-time bookkeeper for her husband's packaging business, Jax Enterprises LLC in Charlotte, North Carolina, earning $54,000 in W-2 income per year. She maintained brokerage accounts with James T. Flynn, a broker-dealer with Voya Financial Advisors (from May 2013 to February 2017) and IFS Securities (from February 2017 to February 2018), located in Greenville, South Carolina. Jones invested a substantial amount of money in these accounts, the product of her hard work and savings over many years.

16. In 2016, Jones approached Flynn because she was interested in long-term investments, including possibly in a variable life insurance policy. As her agent, Flynn had intimate knowledge of Jones' age, income, net worth, assets, and tolerance for financial risk.

17. Defendants maintain a "Just In Time" appointments procedure that permits independent brokers-dealers to be appointed Defendants' authorized agents. On information and belief, Flynn was at times relevant to this Complaint an authorized agent of Defendants, selling their products.

18. Unbeknownst to Jones, Flynn was in serious financial and personal difficulties.

19. The BrokerCheck system was developed by the Financial Industry Regulatory Authority (FINRA), a securities industry oversight group, to help investors and firms "make informed choices about the brokers and brokerage firms with which they may wish to do business." About BrokerCheck Reports, FINRA (accessed February 12, 2020), https://www.finra.org/investors/about-brokercheck-reports. BrokerCheck maintains files regarding securities brokers and firms, including "information about customer disputes, disciplinary events and financial matters on the broker's record." *Id*.

20. Flynn's "BrokerCheck" record, on file with FINRA, reveals that since 2005 he had been subject to more than $280,000 in judgments and liens, and had filed for bankruptcy in 2013 claiming debts of more than $3.5 million. Prior to Jones seeking Flynn's investment advice in 2016, a customer had already filed a complaint against Flynn, for more than $120,000, alleging that his broker "through Mr. Flynn's conduct, executed unauthorized, unsuitable trades involving a single stock in claimant's former brokerage account in October 2012." *See* James Travis Flynn BrokerCheck File (accessed February 12, 2020), https://brokercheck.finra.org/individual/summary/3082615.

21. Defendants had access to Flynn's BrokerCheck file. On information and belief, the existence of these files and the information contained within them are well known within the financial industry.

22. An agent in financial distress has substantial incentives to "over-sell" to his clients, selling them financial instruments unsuitable to their age, needs, income, assets, and risk tolerance, so that the agent can then reap increased sales commissions.

23. This is precisely what Flynn did to Jones. Knowing that she relied upon him because she had little understanding of the securities at issue, he convinced her to purchase a multi-million variable life insurance policy, telling her that this was solid investment for her, and that the premiums on this policy would be tax-deductible.

24. Eventually, on Flynn's advice, on August 16, 2016 Jones applied for approval of what eventually would be Policy No. I7183119, issued by the Ohio National Life Insurance Company in that amount. The original amount of the policy was $4,997,000. On December 2, 2016, again on Flynn's advice, the policy amount was increased to $6 million.

25. So anxious was Flynn to close the approval of this policy that on November 21, 2016, his representative emailed Jones to assure her that Flynn had "spoken to several representatives at Ohio National, and everyone, including the president of the company, has made this a top priority."

26. Jones did not understand that the policy she was purchasing was not a standard variable life insurance policy, but rather was a "key man" policy. These policies are generally purchased by companies to insure the lives of key executives and ensure business continuity in case of their death. Generally,

6

the company pays the premium for these policies and is the beneficiary if the insured dies.

27. This policy was entirely unsuited to Jones' needs and in no way represented a suitable investment for a middle-aged bookkeeper with a relatively modest income from her husband-and-wife company. Moreover, it was extraordinarily expensive, with annual premiums of $200,000. Nor were these premiums tax deductible, as Flynn claimed.

28. Defendants should also have known that this was an entirely unsuitable policy for a bookkeeper at a relatively small commercial concern. This is especially so considering that Defendants were aware (because Flynn stated so on the application) that the premiums were paid directly out of Jones' own income, yet the policy was for the benefit of the company—an almost unheard of arrangement for a key man policy.

29. To ensure that the application was approved, Flynn falsely inflated Jones' income and assets on the application.

30. Nonetheless, despite the red flags that should have put any reasonable issuer on notice that the policy was unsuitable and caused a reasonable issuer to investigate further, Defendants issued the policy.

31. Had Defendants investigated the application because of these red flags, that investigation would have disclosed that (a) Jones was not a "key man" necessary to the operations of Jax Enterprises, which was itself a relatively modest husband-and-wife concern, (b) Flynn falsely inflated Jones'

income and assets and told her the policy premiums were tax deductible, which they were not, (c) Jones' income was entirely insufficient to pay the premiums for this policy, and (d) Flynn was in financial distress and was incentivized to sell unsuitable securities to clients, and in fact had already been accused of doing so by another client.

32. Under the Ohio Administrative Code, "An insurer's issuance of an annuity … shall be reasonable under all the circumstances actually known to the insurer at the time the annuity is issued." Ohio Admin. Code § 3901-6-13(4)(b).[1] The same Code provision requires insurers and agents to "have reasonable grounds for believing that the recommendation is suitable for the consumer on the basis of the facts disclosed by the consumer as to the consumer's investments and other insurance products and as to the consumer's financial situation and needs, including the consumer's suitability information." *Id*. § 3901-6-13(F)(1). Even given Flynn's misrepresentations, Defendants' issuance of this variable life insurance policy was not reasonable under all the circumstances known by Defendants.

33. Defendants are solely responsible for the information they require on life insurance applications, and can shape those information requests as needed to require more or less information about whether a policy is suitable for an insured.

---

[1] Under the Code, "annuity" simply means "an insurance product under state law that is individually solicited." Ohio Admin. Code 3901-6-13(E)(1).

34. Key man policies are extremely profitable for both insurance companies and agents. Such policies generate substantial premiums for the insurance company that issues it, and substantial premiums for the agent who sells it. These high premiums and high commissions were concealed from Jones, who believed she had been sold a policy that suited her age, needs, income, assets, and risk tolerance, when in fact—as Defendants were or should have been aware—she had not.

35. In September 2018, FINRA barred Flynn from association with any FINRA member in all capacities. As of this date, Flynn has been the subject of at least 25 complaints from customers who allege that he steered them into unsuitable or unsustainable investments for his own benefit.

36. Since purchasing the variable life insurance policy from Defendants, Jones has paid $400,000 in premiums.

37. In 2019, after Jones filed a complaint alleging fraud with South Carolina insurance regulators and demanded cancellation of the policy and return of her premiums, Defendants directed the regulators to Voya Financial Advisors and refused to respond substantively to the complaint.

### COUNT 1
### VIOLATION OF SEC RULE 10b-5
### (Against all Defendants)

38. Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

39. Under SEC Rule 10b-5, a person may not directly or indirectly "employ any device, scheme, or artifice to defraud, … make any untrue statement of a material fact or to omit to state a material fact … or … engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5.

40. A failure to make a suitability determination—*i.e.*, whether a particular security is suitable for an investor given, *inter alia*, that investor's age, needs, income, assets, and risk tolerance—can constitute securities fraud under SEC Rule 10b-5. *See, e.g.*, *Clark v. John Lamula Investors, Inc.*, 583 F.2d 594, 599–600 (2d Cir.1978); *O'Connor v. R.F. Lafferty & Co., Inc.*, 965 F.2d 893, 896–97 (10th Cir.1992); *Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245, 252-53 (N.D. Ga. 2005); *see generally*, Lewis D. Lowenfels & Alan R. Bromberg, *Suitability in Securities Transactions*, 54 Bus. Law. 1557 (1999).

41. An insurer's "failure to undertake suitability reviews, or engage in suitability oversight, could constitute securities fraud" under SEC Rule 10b-5, even when an agent is involved, when there is evidence that the insurer was on notice that the policy was unsuitable. *Cooper*, 229 F.R.D. at 255.

42. Here, there was ample evidence that the variable life insurance policy issued to Jones was unsuitable, since key man policies are rarely issued to cover employees of small commercial concerns, and are almost never issued for the benefit of the company when the premiums are paid by the insured.

43. These red flags alone should have demonstrated to Defendants that this policy was unsuitable for Jones.

44. Furthermore, these red flags should have been sufficient to cause Defendants to investigate further the suitability of this policy. Had they done so, that investigation would have disclosed that (a) Jones was not a "key man" necessary to the operations of Jax Enterprises, (b) Flynn falsely inflated Jones' income and assets and told her the policy premiums were tax deductible, which they were not, (c) Jones' income and assets were entirely insufficient to pay the premiums for this policy, and (d) Flynn was in financial distress and was incentivized to sell unsuitable securities to clients, and in fact had already been accused of doing so.

45. Defendants sold Jones an unsuitable product in violation of SEC Rule 10b-5 because a key man policy is highly profitable, more so than other insurance products.

46. Because of Defendants' violation of SEC Rule 10b-5, Jones is entitled to recover actual damages sustained. Such damages include, without limitation, monetary losses and actual, punitive, and consequential damages, in an amount to be proven at trial.

## COUNT 2
## VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT
### (Against all Defendants)

47. Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

48. Jones has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendants' actions as set forth above.

49. Jones' purchase of the variable life insurance policy as alleged in this Complaint was a "consumer transaction" within the meaning of the Ohio Consumer Sales Practices Act, Ohio Revised Code §§ 1345.02(A) & 1345.03(A).

50. Defendants' actions as alleged in this Complaint constitute an "unfair, deceptive or unconscionable act or practice in connection with a consumer transaction" within the meaning of the Ohio Consumer Sales Practices Act, Ohio Revised Code §§ 1345.02(A) & 1345.03(A).

51. Alternatively, Defendants' actions as alleged in this Complaint violate the Ohio Consumer Sales Practices Act because they constitute a violation of Ohio Administrative Code § 3901-6-13(4)(b). *See Frey v. Vin Devers, Inc.*, 80 Ohio App. 3d 1, 6 (1992).

52. Defendants sold Jones an unsuitable product in violation of the Ohio Consumer Sales Practices Act because a key man policy is highly profitable, more so than other insurance products.

53. As a result of this conduct, Jones expended money she would not otherwise have spent, on a variable life insurance policy unsuited for her age, needs, income, assets, and risk tolerance.

54. Jones seeks an order awarding her all actual damages sustained, in an amount to be proved at trial, and in addition any treble damages or other damages to which she might be entitled under Ohio Revised Code § 1345.09, including attorney's fees under Ohio Revised Code Section § 1345.09(F)(2).

## COUNT 3
## NEGLIGENCE UNDER OHIO COMMON LAW
### (Against All Defendants)

55. Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

56. Jones has standing to pursue this claim as Plaintiff has suffered injury in fact and has lost money or property as a result of Defendants' actions as set forth above.

57. Defendants owed a common law duty to Jones to ensure that securities sold to her are suitable given her age, needs, income, assets, and risk tolerance.

58. Defendants breached this duty by failing to investigate clear red flags as alleged herein that the variable life insurance policy sold to her was not suitable.

59. Had Defendants conducted this investigation, they would not have sold the variable life insurance product to Jones.

60. In addition, Ohio Administrative Code § 3901-6-13 creates a duty on the part of all insurers to ensure that the suitability of their products under all the circumstances actually known to the insurer at the time the annuity is issued. Even given Flynn's misrepresentations, Defendants' issuance of this variable life insurance policy was not reasonable under all the circumstances known by Defendants.

61. Furthermore, these red flags should have been sufficient to cause Defendants to investigate the suitability of this policy. Had they done so, that investigation would have disclosed that (a) Jones was not a "key man" necessary to the operations of Jax Enterprises, (b) Flynn falsely inflated Jones' income and assets and told her the policy premiums were tax deductible, which they are not, (c) Jones' income and assets were entirely insufficient to pay the premiums for this policy, and (d) Flynn was in financial distress and was incentivized to sell unsuitable securities to clients, and in fact had already been accused of doing so.

62. These breaches as alleged herein were the proximate cause of Jones' damages.

63. Defendants sold Jones an unsuitable product in breach of their duty under Ohio common law because a key man policy is highly profitable, more so than other insurance products.

64. Because of the breaches described herein, Jones is entitled to recover actual damages sustained. Such damages include, without limitation, monetary losses and actual, punitive, and consequential damages, in an amount to be proven at trial.

## COUNT 4
## UNJUST ENRICHMENT UNDER OHIO COMMON LAW
**(Against All Defendants)**

65. Plaintiff realleges the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

66. Defendants have been and continue to be unjustly enriched, and have obtained and continues to obtain sales, profits, monetary and other unjust rewards due to their wrongful acts complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court grant the following relief against Defendants:

a) that the Court enter a declaration or declaratory judgment that Defendant's acts and practices have violated and continue to violate the Ohio and Federal laws cited herein;

b) that the Court enter an award of actual damages including but not limited to compensatory, incidental, consequential, statutory, treble, and punitive damages amounts as the Court or jury will determine, in accordance with applicable law;

    c)    attorney's fees and court costs, including all recoverable interest;

    d)    any other legal or equitable relief to which Plaintiff may be entitled.

TRIAL BY JURY IS DEMANDED.

                            Respectfully submitted,

                            /s/ *Chetan Patil*
                            Chetan Patil (OH Bar No. 0086995)
                            Patil Law, P.C.
                            1100 Glendon Avenue, Floor 17
                            Los Angeles, CA 90024
                            cp@patillaw.com
                            800-950-6553

February 18, 2020